In re LEMLEY ESTATE BUSINESS TRUST, Debtor.

In re JANET LEMLEY BUSINESS TRUST, Debtor.

In re LEMLEY–CABBINESS FARMS, a Partnership composed of Lemley Estate Business Trust and Janet Lemley Business Trust, Debtor.

LEMLEY–CABBINESS FARMS, A Partnership, Janet Lemley Business Trust and Lemley Estate Business Trust, Plaintiffs,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION et al., Defendant.

Bankruptcy Nos. 585–50185, 585–50184 and 585–50183.
Adv. No. 586–5016.

United States Bankruptcy Court,
N.D. Texas,
Lubbock Division.

Sept. 19, 1986.

Jim Walters, Walters & Associates, Lubbock, Tex., for Lemley-Cabbiness.

Linda J. Fargason, Brock, Morton, & Pigg, Lubbock, Tex., for FDIC.

### MEMORANDUM OF DECISION CONCERNING CROP LIENS

JOHN C. AKARD, Bankruptcy Judge.

*Statement of Facts*

On or about January 16, 1984, Plainsman

Agricultural Credit Corporation (PACC)[1] loaned $356,865.00 to Noah Lemley. As collateral for its loan, PACC received (among other things) a Security Agreement on:

> All farm supplies, farm products and crops: and all natural increase thereof now or at any time hereafter including but not limited to crops located or growing or to be grown on the real property described as follows:

> > All cotton and milo being grown on my 100% interest in 1,280 acre [sic] on Sec. 2 & 9, Blk A–12, Gaines County, Texas; My 100% interest in 317 acres on the W/2 of Sec. 363, Blk D. Yoakum County, Texas & my ¼ interest in 320 acres on the W/2 of Sec. 50, Blk. T & the N/308 acres of Sec. 20, Blk C–38, Terry County, Texas; and all such crops after they have been severed and removed from said real property, and all farm equipment of debtor wherever located including but not limited to that described on attached list. Assn, ASCS Checks & ⅓ lien D/T. THIS WILL INCLUDE ANY AND ALL FUTURE ADVANCES. THIS DOES NOT GIVE THE DEBTOR THE RIGH [sic] TO SELL WITHOUT THE WRITTEN CONSENT OF PLAINSMAN AGRICULTURAL CREDIT CORPORATION.

PACC filed Financing Statements in Gaines, Yoakum, and Terry Counties, Texas on January 24, 1984. The financing statements each contained the same description of crops and real property as quoted above. The box appearing on the statements next to "Products of Collateral" was marked with an "X."

On July 23, 1984, PACC loaned another $50,000.00 to Lemley. In exchange, it took a Security Agreement containing the same description of crops and land. PACC filed a Financing Statement on July 24, 1984 in Gaines County, and on July 25, 1984 in Terry County. There is no evidence that a Financing Statement was filed in Yoakum County.

In August, 1984, Mr. Lemley died and his son-in-law, Johnny Cabbiness, was named Independent Executor of the estate. In that capacity, he attempted to harvest and pay expenses on the 1984 crop. To do so, he used a $50,000.00 A.S.C.S. payment received as a 1985 advance deficiency payment, the $50,000.00 Lemley borrowed from PACC prior to his death, and $34,000.00 of a total of $67,500 received from the sale of 300 bales of the 1984 cotton crop.[2] The remaining $33,500.00 was used in January, 1985 to prepare the land for the planting of the 1985 crop.

The Independent Executor planted the 1985 crop during the period April 18 to April 30, 1985. Funds used included a $25,000.00 loan from the Delta Brotherton Trust, and $86,000.00 credit given by various suppliers.[3]

On or about June 1, 1985, the Independent Executor executed Trust Declarations whereby the community estate of Mr. and Mrs. Noah Lemley was split into two equal halves—the Janet Lemley Business Trust, Janet Cabbiness, Trustee, and the Lemley Estate Business Trust, Johnny Cabbiness, Trustee. The Trustees of those trusts then formed a partnership called Lemley-Cabbiness Farms, a partnership, to run the farming operations. Johnny Cabbiness became Manager of the farming operations. Janet

---

**1.** PACC was a wholly-owned subsidiary of Seminole State National Bank which was subsequently declared insolvent. The Federal Deposit Insurance Corporation (FDIC) is the Bank's statutory receiver.

**2.** The attorney for the Estate of Noah Lemley, deceased, testified that he and an FDIC representative agreed that a small amount of 1984 cotton could be sold and the proceeds used to complete the 1984 harvest. Three hundred bales were sold for $67,500.00. The FDIC disputed it gave such consent, but the Independent Executor who was present in the attorney's office during the telephone conversation between his attorney and the FDIC representative, understood he had consent and acted accordingly.

**3.** The Debtor asserts that the Delta Brotherton Trust has a valid lien on the 1985 crop. The validity of that lien was not presented at the hearing on this matter and, therefore, this opinion does not dispose of that issue.

Cabbiness is the daughter of Mr. and Mrs. Noah Lemley. The two trusts and the partnership succeeded to all the rights and liabilities of Mrs. Noah Lemley and the Estate of Noah Lemley, Deceased.

On June 19, 1985, both trusts and the partnership filed Chapter 11 petitions in bankruptcy. The Debtors are collectively referred to as Lemley-Cabbiness.[4]

Subsequently, $225,000.00 borrowed from Citibank, N.A., of Lubbock, Texas to further finance the 1985 crop and harvest was repaid with 1985 crop proceeds and the Debtors deposited the remaining 1985 crop proceeds in the amount of $137,000.00 in Citibank, N.A.

Lemley-Cabbiness' position is that:

1. The FDIC's liens on crops did not attach until the crop was planted. Thus, when the 1985 crop was planted within the 90 days prior to the filing of the bankruptcy petition, a transfer occurred which is preferential pursuant to 11 U.S.C. § 547(b), (c)(5), and (e)(3);

2. The FDIC's position was improved during the preference period so that the transfer is avoidable;

3. In the alternative, if the proceeds of the 1985 crop are covered by the FDIC's lien on the 1984 crop and are not avoidable, Lemley-Cabbiness and the unsecured creditors are entitled to reimbursement for monies, services, and labor rendered in producing the 1985 crop pursuant to 11 U.S.C. §§ 506(c) and 552(b).

The FDIC asserts that:

1. Its January and July, 1984 liens entitle it to the $137,000.00 proceeds remaining from the Debtors' 1985 crop because its 1984 liens are valid against the 1985 crop and its proceeds;

2. The planting of crops is not a transfer pursuant to § 547(e)(3) and, therefore, cannot be avoided under § 547(c)(5);

3. Expenses incurred in production of the 1985 crop were not reasonable and necessary.

### When Does the Security Interest Attach?

■ It is recognized that a Security Agreement can cover more than one crop year. See generally, Meyer, Keith G., *"Crops" as Collateral for an Article 9 Security Interest and Related Problems*, 15 U.C.C.L.J. 3, (1982). It has been held that 11 U.S.C. § 552(b) entitles a bank, pursuant to a valid lien containing an after-acquired property clause, to the proceeds from crops in existence at the time of the filing of the petition in bankruptcy. See, *e.g. In re Hamilton*, 18 B.R. 868, 871 (Bankr.Co.1982).

In the instant case, the after-acquired property clause in the FDIC security agreement stated that the security interest was not limited to the crops in existence as a result of the 1984 planting, but also applied to crops to be planted in the future. See *In re Kruse*, 35 B.R. 958 (Bankr.Kan.1983). In addition, a security agreement covers the proceeds of the collateral, unless proceeds are expressly excluded. TEX.BUS. & COM.CODE ANN. S 9.203(c) (Vernon Supp.1986). The FDIC's Security Agreement did not exclude proceeds.

A security interest is perfected when it has attached and when all of the applicable steps required for perfection have been taken. TEX.BUS. & COM.CODE ANN. § 9.303 (Vernon Supp.1986). Attachment is governed by TEX.BUS. & COM.CODE ANN. § 9.203 (Vernon Supp.1986) which states:

(a) ... [A] security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:

(1) ... the debtor has signed a security agreement which contains a descrip-

---

4. An order issued by Judge Robert McGuire on January 24, 1985 held that the trusts and partnership were organized and the cases were filed for legitimate business reasons with an eye toward legitimate reorganization. The two trusts are the partners in Lemley-Cabbiness Farms. The trusts have not requested consolidation, apparently because the Lemley-Cabbiness Farms partnership is the operating entity.

tion of the collateral and in addition, when the security interest covers crops growing or to be grown or timber to be cut, a description of the land concerned;

(2) Value has been given; and

(3) The debtor has rights in the collateral.

Normally, a security agreement is signed, value given (loan funded) and then the crops are planted. The debtor does not acquire "rights in the collateral" until the crops are planted. Thus, in most cases a security interest in crops to be planted attaches at the time the crop is planted on the land so designated. *U.S. v. Minster Farms Cooperative Exchange, Inc.*, 430 F.Supp. 566 (D.C.N.D.Ohio 1977). See also *Nivens v. First State Bank of Abernathy* (*In re Nivens*) 22 B.R. 287 (Bankr.N.D. Tex.1982).

Because Lemley-Cabbiness acquired its rights in the 1985 crop when that crop was planted, the FDIC's 1984 crop lien on after-acquired property attached to the 1985 crop on the date the crop was planted.

### Is the Lien a Preference?

A preference is described in 11 U.S.C. § 547 which provides in pertinent part:

.  .  .  .  .

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; . . . .

. . . .

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

■ The first question is whether the planting of the crops constitutes a transfer under § 547. In 11 U.S.C. 101(48) a transfer is defined as:

(48) 'transfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption;

Congress intended this definition to be all-inclusive—as broad as possible. Under this definition, any transfer of an interest in property is a transfer, including a transfer of possession, custody, or control even if there is no transfer of title, because possession, custody, and control constitute interests in property. Senate Report No. 95–989, 95th Cong. 2d Sess. 26–27 (1978) U.S. Code Cong. & Admin.News 1978, p. 5787; See House Report No. 95–595, 95th Cong. 1st Sess. 313–14 (1977), U.S.Code Cong. & Admin.News 1978, p. 5963.

■ In an obvious attempt to conform the Bankruptcy Code to the Uniform Commercial Code[5] Congress provided in § 547(e)(3) "For the purposes of this section, a transfer is not made until the debtor has acquired rights in the property transferred." Thus the planting of the 1985 crops was a "transfer" under § 547.

■ This transfer was for the benefit of a creditor, the FDIC. The debt was an antecedent debt since the 1984 lien which attached to the 1985 crop was taken to

---

**5.** In pertinent part the Texas adoption of the Uniform Commercial Code is the Texas Business & Commerce Code.

secure money loaned in 1984. The lien was not given as a contemporaneous exchange for new value and, therefore, does not meet the exception to avoidable preferences set forth in § 547(c).

■ The transfer was made while the Debtor was insolvent. The insolvency was established by appraisal and other testimony presented at the hearing on this matter. In addition, pursuant to § 547(f) the Debtor is presumed to be insolvent on and during the 90 days immediately preceding the filing of the petition. This presumption was not rebutted.

The transfer occurred when the 1985 crops were planted and the FDIC security interest attached and became perfected between April 18 and April 30, 1985. *In re Douglas Hereford Ranch, Inc.*, 59 B.R. 863 (Bankr.Mont.1986) (holding that perfection of a security interest in the Debtor's property is a transfer at the time of perfection of that interest). *Id.* at 865; see also *Gulf Oil Co. v. First National Bank of Hereford*, 503 S.W.2d 300, 306 (Tex.Civ.App.— Amarillo 1973, no writ). The Chapter 11 proceedings were filed on June 19, 1985, well within the 90–day period prescribed by § 547(b)(4)(A).

■ In order to determine the final element of a preference under § 547(b)(5), the character of the collateral must be determined. *Nivens v. First State Bank of Abernathy (In re Nivens)* 22 B.R. 287 (Bankr.N.D.Tex.1982) points out that § 547(a)(1) categorizes crops as inventory. Pursuant to § 547(c)(5), the holder of a perfected security interest in inventory (crops) is not charged with a preference unless his position is improved during the 90–day preference period and, then, only to the extent his position is improved. *Id.* at 292–93. Thus, in *Nivens* the creditors could realize from the collateral only what they could have realized 90 days before the debtors filed their petition in bankruptcy. *Id.* at 293.

In the instant case, the FDIC could not have realized anything at all from the 1985

crop on the 90th day prior to the petition because the crop didn't exist at that time. The crop was planted during the 90–day time frame and gradually increased in value as it grew. Judge Bill H. Brister's Order of July 31, 1985 in this case, valued the 1985 crop as of July 2, 1985, at $86,-000.00. Therefore, to grant the FDIC any portion of the 1985 crop would constitute a preference forbidden by § 547(b).

Clearly, then, all of the elements of a preference under § 547(b) have been met.

It has been held that no preference occurs where the collateral comes into existence more than 90 days prior to bankruptcy. *Fairchild v. Lebanon Production Credit Assn.*, 31 B.R. 789 (Bankr.S.D.Ohio 1983); *Nivens, supra.*

### 1984 Crop Proceeds Used

■ Although FDIC claimed that $67,-500.00 proceeds of the 1984 crop were used to produce the 1985 crop, no evidence was produced at the hearing to substantiate that claim. The evidence did show, however, that $33,500.00 of the proceeds of the sale of 300 bales of the 1984 cotton crop was used in January, 1985 to prepare the land for the 1985 crop. Such proceeds were traced into the 1985 crop.[6]

Therefore, the Court holds that the FDIC has no lien on any portion of the 1985 crop or its proceeds under the 1984 lien except to the extent of the $33,500.00 mentioned above.

■ The FDIC's pleadings objected to the expenses incurred by Debtors in production of the 1985 crop. Despite a lengthy examination of Johnny Cabbiness, the Manager of the farming operations, no evidence was produced to support the FDIC's allegations. In any event such matters are not proper subjects of discussion in this adversary proceeding.

■ In argument, and in the brief submitted, the FDIC requested the appointment of an examiner pursuant to 11 U.S.C. § 1106. This request was neither timely

---

6. Here we do not deal with an enabling loan    under 11 U.S.C. § 547(c)(3).

nor a proper subject of this adversary proceeding.

 Lemley-Cabbiness sought to use this Adversary Proceeding to get its suppliers to assert any claims which they may have for administrative expenses in this proceeding. Apparently this matter was confusing to the suppliers because none of them responded to this Adversary Proceeding. The Court feels that the procedure for claims established in the Bankruptcy Code and the Bankruptcy Rules is a better vehicle for determining these matters.

Because of the Court's holding, we do not reach the 11 U.S.C. § 552 issues raised by Lemley-Cabbiness' alternative pleadings.

Order accordingly.[7]

---

**7.** This Memorandum shall constitute Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052.